UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Lou Ann Wetherby,                    :
     Plaintiff,                      :
                                     :
     v.                              :File No. 1:08-CV-165
                                     :
Michael J. Astrue,                   :
Commissioner of Social Security      :
     Defendant.                      :


MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Doc. Nos. 4 and 7)

Claimant Lou Ann Wetherby brings this action pursuant
to Title II of the Social Security Act, 42 U.S.C. § 401 *et
seq.*, seeking reversal of the decision of the Commissioner
of Social Security ("Commissioner") denying her request for
review of an Administrative Law Judge ("ALJ")'s decision
that she was not disabled on or before December 31, 2001,
her date last insured.

Pending before the Court are Wetherby's Motion seeking
an order reversing the Commissioner's Decision (Doc. No. 4),
and the Commissioner's Motion seeking an order affirming the
same (Doc. No. 7).  For the reasons explained below, the
Court affirms the Commissioner's Decision.


Background

On or around May 19, 2005, Wetherby applied for
disability insurance benefits.  AR 33A-33E.  On or around
June 28, 2005, the Commissioner denied Wetherby's
application for the first time (AR 24-25), and on or around
September 14, 2005, after reconsideration, the Commissioner
denied the application for a second time (AR 22-23).
Wetherby thereupon requested an administrative hearing (AR
26), which occurred on November 8, 2006 (AR 378-405).  On
February 23, 2007, the ALJ issued a decision determining
that Wetherby was not disabled from her alleged onset date
of October 15, 1996 through her date last insured, December
31, 2001.  AR 11-21.

More specifically, at the second step of the five-step
sequential evaluation process, the ALJ found that, through
the date last insured, Wetherby had severe impairments of
chronic pain syndrome attributed to
fibromyalgia/osteoarthritis, bilateral carpel tunnel
syndrome, and migraine headaches.  AR 16-17.  At the third
step, the ALJ found that, through the date last insured,
Wetherby did not have an impairment or combination of
impairments that met or medically equaled an impairment
listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 17.

Finally, at the fourth step, the ALJ determined that, through the date last insured, Wetherby had the residual functional capacity to perform a range of sedentary exertion work activity, and was able to perform her past relevant work as a receptionist as that work was actually performed. AR 17-21. In making this determination, the ALJ noted, in pertinent part, that: (1) Wetherby had a "sporadic treatment history prior to December 31, 2001;" and (2) Dr. Szostak's office notes "failed to reveal evidence of any treatment for [Wetherby's] alleged pain syndrome." AR 19.

Wetherby filed a request for review of the ALJ decision, which request was denied by the Appeals Council on June 13, 2008. AR 3A-5. Wetherby now asks this Court to reverse the ALJ decision or remand for further proceedings, while the Commissioner seeks an order affirming the ALJ decision.

The medical records submitted in support of Wetherby's application for disability benefits demonstrate a history of treatment for chronic pain syndrome, fibromyalgia, carpal tunnel syndrome, myofascial pain, and migraine headaches dating back to 1995. An x-ray report dated March 1995 indicates that "[d]iffuse minimal degenerative changes" were

demonstrated in Wetherby's thoracic spine, and that "[t]he bones are demineralized." AR 104. Results of a nerve study completed by Wetherby in April 1996 were "compatible with" a diagnosis of mild right-sided and borderline left-sided carpal tunnel syndrome. AR 130.

In February 1998, Wetherby began treatment with Dr. Thomas McCormick, M.D., who noted at Wetherby's initial office visit that, although she "has had muscle shoulder aches and pains going on for years," and "has chronic pain syndrome" as well as "dry skin," Wetherby "is pain free at this point in time." AR 305. Dr. McCormick concluded from Gregory's initial office visit that "chronic pain syndrome of fibromyalgia" was the "most likely diagnosis." *Id.*

Dr. McCormick apparently referred Wetherby to a specialist, Dr. Bucksbaum, for ongoing care, but in a treatment note dated April 1999, Dr. McCormick stated there was an apparent communication problem between Wetherby and Dr. Bucksbaum, and as a result, Wetherby saw Dr. Bucksbaum on only two occasions and thereafter obtained her medications unsupervised. AR 305, 314. In the same treatment note, Dr. McCormick recorded the following diagnostic impression: "Chronic pain syndrome, narcotic use.

Tobacco use. Noncompliance with medical regimen, at least in reference to follow ups." AR 314.

From August 1999 through December 2001, Wetherby saw Dr. McCormick on four occasions. AR 316-318, 330. During these visits, Dr. McCormick noted that Wetherby continued to complain of chronic aches and pains, and suffered from obesity, tension headaches, asthmatic bronchitis, and sinusitis in a smoker. AR 316-318. Dr. McCormick instructed Wetherby to refrain from self-medicating and quit smoking. AR 314, 318, 330.

During the same time period (1999-2001), Wetherby received treatment from Dr. Peter Szostak, D.O. AR 157-178. Dr. Szostak's initial treatment note, dated May 19, 1999, reflects that he "elected not to treat" Wetherby's migraine headaches at that time, and instead instructed her to "remov[e] all offending analgesic agents, both over the counter and prescription, as well as any and all narcotics which have been prescribed for headache symptoms," and to return in one month for assessment. AR 159. At the next appointment, Dr. Szostak prescribed Desipramine, but Wetherby refused to take the medication, stating that it "would interfere in her lifestyle," which included "ETOH

[(ethanol)] consumption on a regular basis."  AR 161-162.
Thereafter, Dr. Szostak prescribed a variety of medications
to treat Wetherby's headaches, and Wetherby experienced some
improvement such that, as of October 2001, Dr. Szostak
reported that Wetherby "has been doing extremely well."  AR
178.  Wetherby's next visit with Dr. Szostak was in April
2002, at which time Dr. Szostak noted that Wetherby's
headaches "have been under great control," but that she "has
numerous body aches and pains as well as muscle knots
secondary to her fibromyalgia."  AR 179.

From approximately November 2002 forward, and more
markedly from November 2003 forward, the records reflect a
decline in Wetherby's condition, particularly her
fibromyalgia and chronic pain.  AR 335, 337-338, 341-347,
350-369.  Specifically, in March 2004, Dr. McCormick
diagnosed Wetherby with "[p]eripheral edema probably related
to sleep apnea."  AR 351.  In July 2004, Wetherby had carpal
tunnel surgery in her right palm.  AR 355-356.  From
November 2004 through February 2005, Dr. McCormick noted
that Wetherby was walking with a mild limp and had advanced
arthritis in her knee.  AR 359-361.

Beginning in March 2005, Dr. McCormick noted that Wetherby had symptoms of hoarseness, and in April 2005, he diagnosed Wetherby with "ongoing GERD" (gastroesophageal reflux disease).  AR 362, 363, 287-287A.  Also in April 2005, Dr. Howard Weaver, M.D. diagnosed Wetherby with a hiatal hernia, gastroesophageal reflux disease, motility disorder of the esophagus, and constipation.  AR 281.  In June 2005, Dr. McCormick diagnosed Wetherby with not only chronic pain, fibromyalgia, and obesity, but also osteoarthritis, hypertension, and depression.  AR 367.

## Standard of Review

The Commissioner uses the familiar five-step process set forth in 20 C.F.R. § 404.1520 to determine eligibility for benefits.  The claimant bears the burden of proving his or her case at steps one through four, and at step five, the burden shifts to the Commissioner to "'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir.1998)).

In reviewing a Commissioner's decision, the court must limit its inquiry to a review of the administrative record

to determine whether there is "substantial evidence" to support the decision and whether the Commissioner applied the correct legal standard. *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); 42 U.S.C. § 405(g). "'Substantial evidence'" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether an ALJ's findings are supported by substantial evidence, the court must consider "the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, *without substituting a court's judgment for that of the Secretary*, and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'" *Id.* (emphasis added).

Therefore, the Commissioner's decision must be affirmed even where substantial evidence supports the opposite conclusion, so long as such decision is supported by substantial evidence. *See DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

Of particular importance in this case, the claimant must demonstrate that his or her disability commenced during a period in which he or she was entitled to insured status. *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (citing 42 U.S.C. § 423(c)). In other words, the onset date of the claimant's disability must precede the date last insured ("DLI"). *Id.* Thus, evidence regarding the claimant's condition subsequent to the DLI is relevant only to the extent that it elucidates the claimant's condition *while insured*. *See, e.g., Lisa v. Secretary of Dept. of Health and Human Services*, 940 F.2d 40, 44 (2d Cir. 1991).

<u>Analysis</u>

Applying the above law here, Wetherby bears the burden of proving that she suffered from a disability on or before December 31, 2001, and that such disability prevented her from returning to her prior employment. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998). If Wetherby meets that

burden, the burden shifts to the Commissioner to show there is other gainful work in the national economy which Wetherby could perform. *Id.*

Wetherby makes three major arguments in her moving brief, each of which will be separately addressed herein.

1.  Treatment History

Wetherby contends the ALJ's findings that (a) she had a sporadic treatment history prior to December 31, 2001, and (b) Dr. Szostak's notes failed to reveal evidence of any treatment for her pain syndrome, were inconsistent with the evidence. To that end, Wetherby lists in her brief 26 events which, taken together, allegedly demonstrate the extent of her treatment during the relevant time frame. See Wetherby's Memorandum in Support of Motion for Order Reversing Decision of Commissioner, pp. 3-4. The Court finds Wetherby's contention unpersuasive.

First, it must be noted that the ALJ's decision clearly separates Wetherby's treatment for chronic pain from her treatment for carpel tunnel syndrome and migraine headaches. AR 19. With regard to her migraine headaches, an October 18, 2001 note by Dr. Szostak reveals that although Wetherby had experienced "several minor headaches,"

"overall she has been doing extremely well," and her condition was "stable." AR 178. Six months later, on April 16, 2002, Dr. Szostak observed that Wetherby's headaches were "under great control." AR 179.

As the Commissioner notes, the ALJ's finding that Wetherby had a "sporadic treatment history" prior to December 31, 2001 related only to Wetherby's "pain syndrome." AR 19. This finding is supported by the undisputed fact that Wetherby had only six office visits with Dr. McCormick, her primary care physician, over an approximate five year period, from the date her disability began (October 1996) through her last date of insurance coverage, December 31, 2001 (see AR 305, 314, 316-318, 330); and her first post-December 31, 2001 visit to Dr. McCormick did not occur until almost five months later, on May 13, 2002 (*id.* at 334).

Wetherby's inclusion of appointments she had with Dr. Szostak for the purpose of refuting the ALJ's determination that she had a sporadic treatment history regarding her pain syndrome is unconvincing, as the record demonstrates that, during the relevant time period (through December 31, 2001), Dr. Szostak treated Wetherby's *headaches*, not her general

pain syndrome, as the ALJ explicitly recognized. (See AR
19, 160, and the "assessment" and "plan" sections of Dr.
Szostak's treatment notes found at AR 159, 161-165, 169-174,
and 177-178.) The mere fact that Dr. Szostak referenced
Wetherby's history of fibromyalgia in his treatment records
does not refute this fact, as he also referenced
hypertension, chest pain, and other ailments which he did
not treat. Although Wetherby does not discuss the point,
Dr. McCormick's statement in his treatment notes dated
November 15, 1999, that the "[t]reatment of [Wetherby's]
fibromyalgia is deferred to Dr. Szostak" (see AR 317),
appears to be a mistake, as it is unsupported (and in fact
refuted) by the remaining records, including both Dr.
McCormick's and Dr. Szostak's treatment notes.

Wetherby's inclusion of treatment notes related to her
emergency room visit on May 16, 1999 for the purpose of
refuting the ALJ's determination that she had a sporadic
treatment history regarding her pain syndrome is also
unavailing, as the record reveals that the emergency room
visit was due to Wetherby's complaint of a migraine
headache, not her pain syndrome. AR 137. Notes from that
visit reveal no evidence of fibromyalgia.

Wetherby also references blood and other medical tests to which she submitted during the relevant time period for the purpose of refuting the ALJ's determination that she had a sporadic treatment history regarding her pain syndrome. AR 166, 175, 210, 310, 320, 328-329, 332. But these tests do not expressly relate to her pain syndrome, and Wetherby fails to effectively correlate them to her treatment for chronic pain. Further, it is not readily apparent from the record, and Wetherby fails to explain in her papers, if and how the results of these tests reveal abnormalities in general or specifically related to her chronic pain.

Overall, after considering the whole administrative record, the Court finds that there is substantial evidence to support the ALJ's findings that (1) Wetherby had a "sporadic treatment history prior to December 31, 2001" with respect to her pain syndrome, and (2) Dr. Szostak's pre-December 31, 2001 notes "fail to reveal evidence of any treatment for her alleged pain syndrome." AR 19.

2. <u>Post-December 31, 2001 Medical Records</u>

Next, Wetherby contends the ALJ improperly refused to consider evidence pertaining to her condition after the expiration of her insured status, i.e., post-December 31,

2001.  To that end, Wetherby specifically cites to Dr.
Szostak's treatment notes dated April 16, 2002 and Vermont
Sports Medicine Center's treatment notes dated April 12,
2002 and May 3, 2002, respectively.  AR 139-140, 179.

Contrary to Wetherby's contention, however, the record
reveals that the ALJ did in fact consider records and
reports dated after December 31, 2001.  The ALJ specifically
cites to such evidence in his Decision:  "Although the
claimant's medical records do reveal evidence of findings
indicative of a gradual deterioration in her overall
condition over the course of the years subsequent to her
date last insured (December 31, 2001), with evidence of
increasingly frequent treatment of her chronic pain syndrome
(monthly visits) (Exhibits 17F and 8F) as well as
gastroesophageal reflux disease with voice hoarseness
(Exhibit 13F); sleep apnea (Exhibit 11F); urinary
incontinence (Exhibit 10F); and increased symptoms of carpal
tunnel syndrome ultimately resulting in a need for surgery
in 2004 (Exhibit 7F) . . . ."  AR 20 ¶ 1.  The ALJ also
states in his Decision that he "considered the Medical
Source Statement prepared by [Wetherby's] treating

physician, Dr. Thomas McCormick. M.D., dated May 3, 2006 . .
. ." *Id.* at ¶ 2.

Moreover, the treatment notes referred to in
Wetherby's brief do not, in and of themselves, support a
determination that Wetherby was disabled on or before
December 31, 2001.  Dr. Szostak's treatment note of April
16, 2002 merely states that Wetherby's headaches "have been
under great control with only several minor headaches since
her last visit," and that Wetherby "has numerous body aches
and pains as well as muscle knots secondary to her
fibromyalgia."  AR 179.  The Vermont Sports Medicine Center
note dated April 12, 2002 reflects only what other documents
in the record demonstrate - that Wetherby had been diagnosed
with fibromyalgia, migraine headaches, and hypertenstion;
and also that Wetherby suffered upper arm, elbow, shoulder,
neck, and ear pain "for the past month," i.e., from
approximately March 12, 2002 through April 12, 2002.  AR
139.  The Vermont Sports Medicine Center note dated May 3,
2002 indicates that Wetherby was experiencing "[m]uch less
pain" and that she was "[a]ble to use [her] arm for
[activities of daily living] but still has pain lifting and
carrying light loads."  AR 140.

Not only do these treatment notes fail to reference Wetherby's condition prior to December 31, 2001, they fail to reference the severity of Wetherby's symptoms at any time. In any event, the question is unimportant, given that the ALJ determined in Wetherby's favor on this issue, finding that her fibromyalgia and chronic pain syndrome did in fact constitute severe impairments at step two of the five-step disability evaluation process. AR 16-17.

### 3. Residual Functional Capacity

Finally, Wetherby argues that there is not substantial evidence in the record to support the ALJ's rejection of Dr. McCormick's May 2006 residual functional capacity assessment. As noted above, Wetherby bears the burden of demonstrating she did not have the residual functional capacity to return to her past relevant work through December 31, 2001. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995); *see* 20 C.F.R. §§ 1520(e), 416.920(e).

The Commissioner's regulations provide that the medical opinion of the physician engaged in the primary treatment of the claimant is given "controlling weight," provided it is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion, . . . that opinion will not be deemed controlling." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.").

After considering the entire record, including documents dated post-December 31, 2001, the Court finds that, despite Dr. McCormick's May 2006 residual functional capacity assessment, there is substantial evidence to support the ALJ's decision that, through December 31, 2001, Wetherby did in fact have the residual functional capacity to perform "sedentary" work, as that term is defined in 20 C.F.R. § 404.1567(a).

The ALJ stated in his Decision that he found Dr. McCormick's Medical Source Statement dated May 3, 2006 "to be inconsistent with [Dr. McCormick's] own treatment notes as well as with the objective medical evidence of record . . . with regard to the claimant's condition prior to her last date insured (December 31, 2001)." AR 20 ¶ 2. The ALJ further stated that Dr. McCormick's treatment notes dated prior to December 31, 2001 "fail to reveal evidence of any objective findings which would substantiate his assessed level of functional limitation." *Id.* The record supports these findings.

It is noteworthy that the Medical Source Statement prepared by Dr. McCormick on May 3, 2006, which Dr. McCormick post-scripts approximately two weeks later, on May 15, 2006, to indicate that it is "[b]ased on Mrs. Wetherby's condition *as of 12/31/2001*" (AR 370-373) (emphasis added), makes exactly the same findings as another Medical Source Statement prepared by Dr. McCormick on July 27, 2006, apparently with respect to Wetherby's condition *on that 2006 date* (AR 374-377). The record simply does not support Dr. McCormick's ostensible position that the severity of Wetherby's condition and the resultant impact on Wetherby's

day-to-day life was the same from the period prior to
December 31, 2001 as it was from the period five years
later.

Rather, and as noted above, the record reveals that
Wetherby had office visits with Dr. McCormick on only six
occasions during the approximate four-year period from
February 13, 1998 through December 21, 2001 (AR 305, 314,
316-318, 330), and, in comparison, she had office visits
with Dr. McCormick on over 20 occasions during the
approximate three and one half year period from January 1,
2002 through July 8, 2005 (AR 334-368).  The increased
frequency of Wetherby's office visits with Dr. McCormick
post-December 31, 2001 supports the compelling inference
that Wetherby's condition worsened considerably in the
period after that date.

Also significant, Dr. McCormick's May 3, 2006 Medical
Source Statement is unreliable on its face, as it includes
inconsistencies which reveal that it was carelessly
completed, at least in part.  For example, on page three of
the Statement, Dr. McCormick checked off boxes indicating
that Wetherby had "UNLIMITED" functional ability in
"[r]eaching all directions (including overhead)" and

"[h]andling (gross manipulation)." AR 372. Yet, in the
next paragraph, Dr. McCormick checked off boxes indicating
that Wetherby was only "OCCASIONALLY" able to "REACH[]" and
"HANDL[E]." *Id.* Also, when asked to "[d]escribe how the
activities checked 'limited' are impaired and the basis of
additional manipulative limitations" and state "[w]hat
medical/clinical findings support your conclusions," Dr.
McCormick simply wrote, "osteoarthritis" and "fibromyalgia."
*Id.*

Finally, Dr. McCormick's May 3, 2006 Medical Source
Statement, which Dr. McCormick relates back to December 31,
2001, is inconsistent with his own treatment notes from the
period on and before December 31, 2001. As between the
Medical Source Statement dated May 3, 2006 and the
contemporaneous treatment notes dated on or before December
31, 2001, the ALJ properly assigned more weight to the
contemporaneous notes. *See Jones v. Heckler*, 614 F. Supp.
277, 280 (D. Vt. 1985) ("A treating physician's opinion may
be applied retroactively to draw conclusions about a
claimant's medical condition *prior* to treatment. That
opinion, however, is not entitled to the same weight as
otherwise would be given if the examination was

*contemporaneous* with the claimed period of disability.")
(internal citations omitted) (emphasis in original).

Although Dr. McCormick's pre-December 31, 2001
treatment notes include a diagnosis of "[c]hronic pain
syndrome of fibromyalgia" (AR 305), they do not indicate any
functional limitations.  Moreover, Dr. McCormick's notes
regarding his first visit with Wetherby, which visit was to
"establish[] care" for Wetherby, indicate that Dr. McCormick
"ha[d] no records" and that Wetherby "ha[d] not been
evaluated in some period of time."  AR 305.  Taken together,
Dr. McCormick's notes prior to December 31, 2001 reflect a
diagnosis of "fibromyalgia syndrome," and later,
"[a]sthmatic bronchitis and sinusistis in a smoker," and
chief complaints of "chronic aches and pains," including
chronic headaches, and "no other symptoms."  AR 316, 318.

While courts recognize that fibromyalgia is "a disease
that eludes [objective] measurement," *Green-Younger v.
Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003), it has been held
that mere diagnosis of fibromyalgia without a finding as to
the severity of symptoms and limitations does not mandate a
finding of disability, *see id.* at 104 (physician diagnosing
fibromyalgia stated that the condition "in certain instances

can be debilitating"). Moreover, with respect to pain, the Second Circuit has explained that "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983). Unlike the record in *Green-Younger v. Barnhart*, which demonstrated that the claimant was diagnosed with "severe" fibromyalgia resulting in marked limitations in her daily living activities, *id.* at 104, the record in this case does not demonstrate that Wetherby's fibromyalgia rose to the level of markedly limiting her daily living activities *on or before December 31, 2001*, her date last insured. *See Rivers v. Astrue*, 280 Fed. Appx. 20, 22 (2d Cir. 2008).

Rather, the pre-December 31, 2001 record, while demonstrating that Wetherby suffered pain, including headaches, demonstrates that Wetherby made some progress at times and experienced continuous periods without pain. For example, Dr. Szostak's treatment note dated May 20, 1999 states that Wetherby's headaches were occurring only "at about three episodes per month." AR 160. And in a treatment note dated October 18, 2001, Dr. Szostak stated

that Wetherby "notes having several minor headaches, but notes that overall she has been doing extremely well and has been tolerating her medication without any difficulties." AR 178. Dr. McCormick himself, in his initial examination of Wetherby on February 13, 1998, states that, although Wetherby "is generally in pain," she "is pain free at this point in time." AR 305.

There are no comments in either Dr. McCormick or Dr. Szostak's pre-December 31, 2001 treatment notes indicating that Wetherby was unable to stand or walk for two or more hours at a time, as Dr. McCormick indicated (not insignificantly, merely by checking off a box, without explanation) in his May 2006 Medical Source Statement. AR 370. And in fact, in a treatment note dated July 17, 1995, Dr. Saroka diagnosed Wetherby with "myofascial pain" but "*discouraged further disability*" on that basis. AR 116 (emphasis added). Thereafter, Wetherby returned to her job involving a range of sedentary work activity, and the record reveals no indication that she sought treatment for her pain until well over two years later, when she started seeing Dr. McCormick. Years later, Dr. McCormick himself, in a letter

dated May 31, 2005, stated that Wetherby "could walk, sit and stand," and "handles objects well."  AR 365.

Wetherby's treatment notes also indicate that she refused to comply with several instructions given to her by her medical providers.  For example, she refused to quit smoking (AR 318), failed to comply with her "medical regimen, at least in reference to follow ups" (AR 314), refused a proposed rheumatologic consultation (AR 316), engaged in self-medication despite Dr. McCormick's instructions about the inappropriateness of this (AR 314, 330), concealed her significant use of alcohol from Dr. Szostak (AR 157, 162), and refused to stop drinking alcohol thereby preventing her from being able to take the medication prescribed by Dr. Szostak (AR 162).  *See* 20 C.F.R. § 416.930 (setting forth need to follow prescribed regimen and inquiry to be conducted by ALJ in cases where it is not followed).  Additionally, Dr. Szostak's treatment notes include numerous references to a "significant analgesic rebound component,"[1] attributing Wetherby's

---

[1]
"Analgesic rebound" is the term used to describe a cycle of analgesia, rebound headache, and more analgesia, where patients with frequent headaches (tension or migraine) self-medicate in an attempt to preempt or cure the headaches.

migraine headaches at least in part to a "vicious cycle" of Wetherby's overuse of medications to control her headaches. AR 159, 160, 161, 162.

The ALJ did not address Wetherby's non-compliant behavior in his Decision, and did not consider it to be a determinative factor in deciding that Wetherby was not disabled as of December 31, 2001. Likewise, the Court does not consider such behavior to be a determinative factor in making its decision on the instant Motions.

For the foregoing reasons, the Court finds that there is substantial evidence in the record to support the ALJ's determination that the medical evidence regarding Wetherby's condition pre-December 31, 2001 is inconsistent with Wetherby's alleged level of functional limitation during that time period, and that such evidence does not substantiate the assessed level of Wetherby's functional limitation provided by Dr. McCormick in his May 2006 Medical Source Statement. Rather, there is substantial evidence to support the ALJ's determination that Wetherby was capable of performing her "past relevant work" as an appointment clerk as of December 31, 2001, and thus was not disabled on or

before her date last insured.  20 C.F.R. §
404.1520(a)(4)(iv) and (f).

<u>Conclusion</u>

Accordingly, I recommend that the Commissioner's Motion
for an order affirming the Commissioner's Decision (Doc. No.
7) be GRANTED, and Wetherby's Motion for an order reversing
the same (Doc. No. 4) be DENIED.

Dated at Burlington, in the District of Vermont, this
<u>13th</u> day of March, 2009.


                        <u>/s/ John M. Conroy</u>
                        John M. Conroy
                        United States Magistrate Judge


Any party may object to this Report and Recommendation
within 10 (ten) days after service thereof, by filing with
the Clerk of the Court and serving on the Magistrate Judge
and all parties, a written objection which shall
specifically identify the portion(s) of the proposed
findings, recommendations, or report to which objection is
made and the basis for such objection.  Failure to file an
objection within the specified time waives the right to
appeal the District Court's order.  *See* Local Rules 72.1,
72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b),
6(a), 6(e).